UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| VERONICA R. SMITH, | ) | Civil Action No.: 4:11-cv-3457-MGL-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MARTEK BIOSCIENCES KINGSTREE | ) | |
| CORPORATION; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This action arises out of Plaintiff's employment with Defendant Martek Biosciences Kingstree Corporation. Plaintiff alleges she experienced race and gender discrimination with respect to her training, performance evaluation and discipline in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000(e) et seq. Presently before the Court is Defendant's Motion for Summary Judgment (Document # 24). All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this Report and Recommendation is entered for review by the district judge.

## II.    FACTS

### A.    The Kingstree Plant

Defendant Martek Biosciences Kingstree Corporation (Defendant or Martek) operates a facility in Kingstree, South Carolina (Kingstree Facility), where it produces products made from microalgae. The Kingstree Facility employs approximately 250 employees. In the summer of 2007,

Plaintiff interviewed with Wanda Black (Black), Assistant Director, and Joe Weatherford (Weatherford), System Administrator, in Martek's IT Department in the Kingstree Facility. Weatherford Aff. ¶ 1 (Ex. S to Def. Motion). On or about June 28, 2007, Martek hired Plaintiff as a temporary employee for the position of Desktop Technician. Pl. Dep., pp. 15, 18-19, 21 (Ex. A to Def. Motion); Temp./Part-Time Emp. Status (Ex. B to Def. Motion); New Emp. Info. Sheet (Ex. C to Def. Motion). On October 3, 2007, Martek offered and Plaintiff accepted the full-time position of IT Assistant[1] in the Kingstree Facility, a position she held until her termination on or about January 11, 2010. Offer Letter (Ex. D to Def. Motion); Lee Aff., ¶ 4 (Ex. R to Def. Motion); Corrective Action Notice (Ex. K to Def. Motion).

Plaintiff's initial supervisor was Art Treichel (Treichel), Manager of IT Operations, located in Martek's facility in Columbia, Maryland. In or around the end of 2007, Martek promoted Treichel to Manager of Networking and Information Security, and John LeMay (LeMay) assumed responsibilities as Manager of Systems and Network Operations. Pl. Dep., p. 40; Weatherford Aff. ¶ 2. Thereafter, Martek reorganized the IT Department's reporting structure and Weatherford assumed direct supervisory responsibilities over Plaintiff.[2] Pl. Dep. p. 143; Lee Dep. p. 100 (Ex. Q to Def. Motion). At the time of her termination, Plaintiff was Martek's only IT employee supervised by Weatherford. Pl. Dep. p. 134.

**B.     Plaintiff's Job Responsibilities**

Plaintiff's primary job responsibilities involved the Help Desk support function in the

---

[1]Plaintiff's position is also referred to as Desktop Technician or Helpdesk Technician throughout the record. See Corrective Action Notice; Weatherford Aff. ¶ 3.

[2]LeMay assumed supervisory responsibilities over Weatherford. Pl. Dep. p. 143.

Kingstree Facility. Lee Dep. p. 98. In her role, Plaintiff served as an internal "customer service" agent for other Martek employees experiencing technological problems.  Weatherford Aff. ¶ 3. Plaintiff was tasked with responding to employee requests for technical assistance and troubleshooting in the Kingstree Facility. Pl. Dep. pp. 27-30. Accordingly, she was responsible for the prompt, helpful and courteous interaction with Martek employees. Lee Aff. ¶ 4; Lee Dep. p. 119. Plaintiff was responsible for timely retrieving, reviewing, and responding to the electronic tickets[3] located in Martek's data system, "Track-it". Pl. Dep. pp. 27-28. Track-it itemizes the electronic tickets for all Martek facilities nationwide; the electronic tickets identify the name of the complaining employee, his/her facility location, and sets forth a general summary of the problem. In turn, Plaintiff was instructed to communicate with the complainant, either remotely over the internet or in person, to solve the technological issue in a timely manner.  Pl. Dep. p. 28; Weatherford Aff. ¶ 4.  All electronic tickets remain in Track-it until the complaining employee confirms the issue has been fully resolved.  Pl. Dep. p. 30.  Plaintiff's duties and responsibilities involving the Track-it system remained the same throughout her employment.  Pl. Dep. p. 64. She was the only employee in the Kingstree Facility primarily tasked with Help Desk duties.  Pl. Dep. p. 41; Weatherford Aff. ¶ 5.  However, employees at the Kingstree Facility were instructed that Weatherford may assist Plaintiff with Help Desk duties when tickets were elevated and required his involvement.  Martek Emails p. 4 (Ex. B to Plaintiff's Response).

### C.    Plaintiff's Job Performance

The record reveals that there was a "significant increase in Helpdesk service requests" from

---

[3]Martek employees generate electronic tickets when experiencing computer or electronic problems.

November of 2007 through January of 2008 and Treichel sent an email to all the staff at the Kingstree Facility commending the Helpdesk staff for completing a record number of Helpdesk service requests in January. Martek Emails p. 4. However, in March and April of 2008, Treichel and David Ronis (Ronis), VP and Client Information Officer, received numerous email complaints regarding Plaintiff's and Weatherford's failure to timely respond to or resolve Helpdesk requests. See Martek Emails pp. 18-22, 31, 34, 38-39.

On July 23, 2008, Martek placed Plaintiff on a Performance Improvement Plan (PIP) after receiving numerous complaints regarding her "[in]ability to respond timely and courteously to Martek [employee] desktop computer problems . . . ." PIP(Ex. M to Def. Motion); Lee Aff. ¶ 5. Brian Lee (Lee), Senior Manager of Human Resources, provided Plaintiff specific examples of her unacceptable behavior:

- Abandoning your desktop support post and leaving the plan during a critical IT situation on 6/16, while the email system was not working you stopped responding to calls and left the plant from 8:29 a.m. until 10:16 a.m. without approval.
- Repeated, lengthy and unnecessary visits to the Maintenance Department, distracting Maintenance personnel.
- Failing to assist staff personnel re-install peripheral equipment such as printers.
- Lacking courtesy and professionalism to staff individual that requested assistance regarding an unanticipated issue to supply COO with laptop.
- Refusing to enter areas of the plant that require you to wear safety equipment per company policy.

PIP; Lee Aff. ¶ 5. The PIP provided that Plaintiff's performance would be monitored for eight weeks. Perf. Inprov. Plan. The PIP warned that Plaintiff's continued pattern of poor customer service, unacceptable performance, and failure to meet expectations may result in her termination. PIP.

In late September of 2008, Ronis, Treichel and Lee exchanged emails, discussing the need to check with Kingstree Facility employees regarding Plaintiff's customer service performance and to provide feedback to Plaintiff, although it is not clear whether this feedback was ever given. Martek Emails p. 89. Lee indicated in the emails that he felt Plaintiff was doing better. Martek Emails p. 89. On October 22, 2008, Plaintiff emailed Treichel to request some training. Martek Emails p. 95. She also noted that "things are getting very stressful when I can't get [Weatherford] to help me with issues I don't know." Martek Emails p. 95. Treichel informed her that training was approved for her under the budget for the new fiscal year beginning in November and to send him some recommendations. Martek Emails p. 95.

In November of 2008, Martek provided Plaintiff with her annual Performance Appraisal, which rated her performance as "Needs Improvement." The Appraisal acknowledged that she "improved greatly recently in her customer service and communication skills," but also identified areas for development and growth:

- Maintain and improve her timely and courteous response to end-user issues.
- Continue to improve her Help Desk ticket management, by tracking and documenting issues in a timely manner.
- Continue to improve customer service through timely communication with end users.
- Increase her technical knowledge through at least one class in a technical, communication, or customer service area.

Pl. 2008 Perf. Appraisal (Ex. N to Def. Motion); Lee Aff. ¶ 5; Weatherford Aff. ¶ 11; Pl. Dep. pp. 108-11.

Plaintiff's supervisors continued to receive complaints regarding Plaintiff's attitude and failure to timely respond to or resolve their technical issues. On August 25, 2009, Martek employee Carolyn Fort (Fort) emailed LeMay and Weatherford stating she had an "unpleasant experience" with

Plaintiff in her Help Desk support capacity: "[S]he was very curt and obviously did not want to be on the phone with me . . . . [T]hought you should know that she was not exactly customer-service-oriented (to say the least!)." Fort Email (Ex. E to Def. Motion). Approximately one month later, on September 29, 2009, Martek employee Beth Cribb (Cribb) emailed Weatherford also complaining about Plaintiff's attitude: "I just want you to know, that I did not appreciate the way Veronica attacked me yesterday afternoon with Rachel's memory stick." Cribb Email (Ex. F to Def. Motion). On or about October 19, 2009, Martek employee Katherine Martin (Martin) emailed Weatherford complaining about Plaintiff's failure to timely purchase a software program for employees in the Accounting Department. Martin Email (Ex. G to Def. Motion). On or about December 16, 2009, Martek employee Nikki Lee (N. Lee) requested Plaintiff fix her phone and internet connection. Plaintiff consulted with Weatherford, and he instructed Plaintiff to retain an independent contractor to remedy a hardwiring issue. The hardwiring issue was resolved on or about December 17, 2009. However, Plaintiff failed to follow through and complete the IT portion of N. Lee's request, thus necessitating Weatherford's intervention on or about December 28, 2012. Plaintiff's delays caused N. Lee to go without phone or internet connectivity for approximately twelve days. Lee and Weatherford Emails (Exs. H & I to Def. Motion); Pl. Dep. pp. 77-82.

On December 1, 2009, Martek provided Plaintiff with her annual Performance Appraisal, again rating her performance as "Needs Improvement." The 2009 Appraisal reiterated her customer service shortcomings: "[S]he must also make some room for improvement. She does not pursue complete customer satisfaction with her end-users, and she shows limited interest in seeking or acting on customer feedback." Pl. 2009 Perf. Appraisal (Ex. O to Def. Motion); Pl. Dep. p. 114; Weatherford Aff. ¶ 11. In her remarks on the Performance Appraisal, Plaintiff stated that she was

-6-

working as hard as she could and that she was one person to 250 or more.  2009 Perf. Appraisal.  She added that she was interested in receiving additional training from her manager.   2009 Perf. Appraisal.

On December 16, 2009, Ronis emailed Weatherford inquiring about Plaintiff's outstanding and uncompleted electronic tickets. The following morning, Weatherford emailed Plaintiff asking her to devise a strategy to resolve the problem. In addition, he informed Plaintiff that management was questioning the minimal number of tickets she recorded since November 1, 2009. Weatherford reminded Plaintiff that she must create an electronic ticket for all work completed, regardless of how it was assigned to her. Weatherford and Plaintiff exchanged additional emails that morning, whereby Plaintiff acknowledged her failure to create electronic tickets for all work orders. Weatherford asked Plaintiff to come up with a plan for creating tickets and requested they meet in person to further discuss the issues that same afternoon. Plaintiff failed to respond to Weatherford's last email, show up for the meeting, or provide the requested information necessary to resolve the issues raised by Ronis.  Weatherford 12-17-09 Emails (Ex. P to Def. Motion); Weatherford Aff. ¶ 12.  After a second email from Weatherford, in which he expressed his surprise that she left the office for the day without meeting with him, Plaintiff responded that she had been very busy and then had to leave early for a doctor's appointment.  Weatherford 12-17-09 Emails.  She further stated that she did not think that she needed to come up with a plan.  Weatherford 12-17-09 Emails.

On or about December 18, 2009, Weatherford met with Plaintiff to discuss the forgoing complaints and her ongoing performance issues. Weatherford reiterated Plaintiff's job responsibilities, including communication, customer service, accurate ticketing ("making sure all tickets are submitted up to the week, no later than month end"), and timesheet and paid time off

(PTO) requests. In addition, he scheduled a standing meeting with Plaintiff each morning to discuss her "plan of the day." Lee Aff. ¶ 5; Weatherford 12-18-09 Email (Ex. J to Def. Motion). Weatherford directly addressed complaints regarding Plaintiff's "practices and professionalism," agreed to provide her additional customer service training, and stressed the importance of handling electronic tickets in an appropriate and timely fashion. Pl. Dep. p. 87. Lastly, Weatherford prohibited Plaintiff from working on holidays without advance approval from management, which she had done the preceding Thanksgiving resulting in double holiday pay. Corrective Action Notice (Ex. K to Def. Motion); Weatherford Aff. ¶ 13.

Despite this counseling from Weatherford, Plaintiff's performance problems continued. For example, on January 1, 2010, contrary to instructions from Weatherford, Plaintiff worked New Years day, a mandatory holiday, without advance approval from management. Corrective Action Notice. Approximately four days later, Ronnie Dennis (Dennis), Manufacturing Specialist, emailed Weatherford complaining about Plaintiff's failure to adequately respond to a printer issue in the Engineering Department. Dennis Email (Ex. L to Def. Motion). Based on these ongoing concerns, on January 7, 2010, Martek audited Plaintiff's electronic tickets, which evidenced only four completed tickets (two hours of logged work) since her latest counseling on December 18, 2009. Corrective Action Notice; Lee Dep. pp. 106-09 (Ex. Q to Def. Motion); Weatherford Aff. ¶ 14.

Based on Plaintiff's aforementioned performance problems and her failure to heed continuous warnings, Martek terminated her employment on January 11, 2010. Corrective Action Notice. Plaintiff's termination was reviewed and approved by Lee, senior management, and legal counsel. Lee Dep. pp. 103-06; Weatherford Aff. ¶ 14.

D.      **Weatherford's Job Performance**

Plaintiff does not dispute her job performance issues.  However, she asserts that she did not receive sufficient training or help from her direct supervisor, Weatherford.  She also asserts that Weatherford had similar job performance issues.  In August of 2006 (prior to Plaintiff's employment), Weatherford was issued a Corrective Action Notice and placed on a three month probationary period for excessive tardies (at least fifty in a seven month period), working overtime during lunch without prior approval, and "failing in his supervisory responsibilities regarding the proper communication of department objectives and technical development of subordinate staff." Weatherford Corrective Action Notice (Ex. A to Pl. Response).

Later, in March of 2008, Treichel began receiving complaints from a Kingstree employee, Ken Turner, regarding a request for a new computer and phone that had originally been made in August of 2007, stating in one email that he had "asked for progress updates on the phone and computer installation from [Weatherford] and [Plaintiff] to no avail."  Martek Emails pp. 10-11, 13. Also, on March 19, 2008, Weatherford received a follow-up email from a Kingstree employee inquiring about when a voicemail issue would be resolved, and noted Weatherford's February 12, 2008, email in which he indicated he would take care of the problem that day.  Martek Emails pp. 14-15.  Another employee emailed Treichel on March 22, 2008, complaining that "we can call both of them [Weatherford and Plaintiff] all day and they will never return your call."  Martek Emails p. 21.  In late March of 2008, Treichel noted to Ronis, "[u]nfortunately, the feedback I get is that [Weatherford's] responsiveness and communication has been perceived as little better.  How fair that is under the current job duties is up for discussion."  Martek Emails p. 34.  In June of 2008, Treichel emailed Ronis and LeMay, stating "I'm sorry to pile one more item on the issues with [Weatherford],

but we have what is now a serious customer service problem that we need to address ASAP." Martek Emails p. 59.  Treichel explained that a request or "ticket" that was originally placed in February, with additional requests placed in April and June, still had not been completed, even though Weatherford had been given a specific deadline of the day before.  Martek Emails p. 59.  In October of 2008, Ronis noted that the friction between Weatherford and Plaintiff was getting worse and likely required intervention from others.  Martek Emails p. 104.

Weatherford received a Performance Appraisal on October 31, 2008, wherein he was given a general performance rating of "good."  Weatherford 2008 Perf. Appraisal (Ex. H to Pl. Response). His Performance Appraisal for 2009 rated him as "excellent."  Weatherford 2009 Perf. Appraisal (Ex. H to Pl. Response).

## III.    STANDARD OF REVIEW

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and

inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992). The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## IV.    DISCUSSION

Plaintiff alleges that Defendant terminated her because of her race and gender. Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff has not produced direct evidence of race or gender discrimination and, thus, must proceed under the burden-shifting proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817,

-11-

36 L.Ed.2d 668 (1973).  Under this burden-shifting scheme, Plaintiff has the initial burden of establishing a prima facie case of discrimination.  Id.  To establish a prima facie case of race or gender discrimination in a termination case, the plaintiff must present facts showing that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) similarly-situated employees outside the protected class received more favorable treatment. White v. BFI Waste Services, LLC, 375 F.3d 288, 295 (4th Cir. 2004).  The fourth element can also be met by showing other circumstances giving rise to a reasonable inference of unlawful discrimination.  Miles v. Dell, Inc., 429 F.3d 480, 486-87 (4th Cir.2005).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to produce a legitimate, nondiscriminatory reason for the disparate treatment. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981).  This is merely a burden of production, not of persuasion.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

Once Defendant has met its burden of production by producing its legitimate, nondiscriminatory reason, the sole remaining issue is "discrimination vel non." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000)(citing Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983)).  In other words, the burden shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason produced by Defendant is not its true reasons, but was pretext for discrimination.  Reeves, 530 U.S. at 143.  Throughout the burden shifting scheme set forth in McDonnell Douglas, the ultimate burden of proving that Defendant intentionally discriminated against Plaintiff remains at all times with Plaintiff.  Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude defendant

-12-

intentionally discriminated against him.

It is undisputed that Plaintiff is a member of protected classes and that she suffered an adverse employment action when she was terminated. However, Defendant argues that Plaintiff cannot show that she was performing her job duties at a level that met her employer's legitimate expectations. "The prima facie case requires the employee to demonstrate that he was qualified in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 514-15 (citations omitted). The evidence in the record reveals that Plaintiff's job performance fell below her employer's expectations at least by July of 2008 (although the record reveals complaints about Plaintiff's performance as early as March 2008) when she was placed on the PIP. The PIP was signed by Brian Lee, Senior Manager of Human Resources, and describes "a pattern of poor customer service and unacceptable performance in your accomplishing your duties." PIP. Although emails from September of 2008, indicate that at least Brian Lee felt Plaintiff's performance had improved, her next Performance Appraisal still rated Plaintiff as "needs improvement." Plaintiff's supervisors continued to receive complaints regarding Plaintiff's performance, and at the end of 2009, Plaintiff was again rated as "needs improvement." Her 2009 Performance Appraisal provided that Plaintiff "does not pursue complete customer satisfaction with her end-users, and she shows limited interest in seeking or acting on customer feedback." Pl. 2009 Perf. Appraisal. In December of 2009, shortly after Plaintiff received her second "needs improvement" appraisal, Weatherford, at the direction of Ronis, asked Plaintiff to come up with a plan of attack for resolving her outstanding tickets and to meet with him that day so that they could discuss it. Plaintiff left without meeting with Weatherford and, when questioned by him about her failure to do so, informed him "I really don't

-13-

see where I need to make a plan." Weatherford 12-17-09 Emails. The next day, Plaintiff met with Weatherford, who set forth expectations for her job performance, including making sure that all tickets were submitted up to the week and requesting approval before working on holidays. Weatherford 12-18-09 Email; Weatherford Aff. ¶ 13. Shortly thereafter, Plaintiff worked on New Year's Day without receiving prior approval as required. Weatherford Aff. ¶ 14. Additionally, an audit of her tickets on January 7, 2010, revealed she had completed only four tickets since her meeting with Weatherford on December 18, 2009. Weatherford Aff. ¶ 14. Weatherford describes this number of tickets as "totally unacceptable." Weatherford Aff. ¶ 14.

As set forth above, the record evidence reveals that Plaintiff's job performance fell below the expectations of her employer. Plaintiff fails to present evidence to the contrary. Instead, Plaintiff argues that to determine whether she was meeting her employer's legitimate expectations, her job performance must be measured against the job performance of other, similarly situated employees. Specifically, Plaintiff refers to Weatherford and argues that he was similarly situated in all relevant respects. However, as discussed in detail below, Plaintiff fails to present sufficient evidence that Weatherford was similarly situated with her, especially with respect to job performance or conduct. While a plaintiff may counter an employer's argument that the plaintiff was not meeting its legitimate expectations with her own evidence that "demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all," Warch, 435 F.3d at 517, Plaintiff has failed to present sufficient evidence to create such an issue of fact.

Additionally, Plaintiff fails to create a dispute of fact as to the fourth element, that is, whether similarly situated employees were treated more favorably or whether other evidence exists that would give rise to an inference of discrimination. Plaintiff argues that her supervisor, Weatherford,

was a similarly situated employee, because they answered to the same supervisors and had the same job responsibilities.  However, the evidence in the record reveals otherwise.

To be similarly situated, a "plaintiff must establish that 'other employees' were similarly situated in all relevant respects; that they 'dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  See Ward v. City of North Myrtle Beach, 457 F.Supp.2d 625, 643 (D.S.C.2006).  "The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." Lightner v. City of Wilmington, 545 F.3d 260, 265 (4th Cir. 2008).  Plaintiff's argument that she and Weatherford had the same supervisor is without merit.  It is undisputed that Plaintiff's direct supervisor was Weatherford.  Weatherford was contacted by other employees when they had complaints about Plaintiff, prepared Plaintiff's 2009 Performance Evaluation, counseled Plaintiff in mid-December of 2009 about her job performance issues, and signed her Termination Notice. Although Plaintiff may have also answered to other supervisors above Weatherford, it is disingenuous to argue that Plaintiff and Weatherford were similarly situated because they had the same supervisor.  Otherwise, it would be a rare occurrence for an employee not to be similarly situated with his supervisor.

Plaintiff also argues that she and Weatherford were similarly situated because they had the same responsibilities.  Plaintiff's job title was IT Assistant.  Weatherford's title was System Administrator.  It is undisputed that Plaintiff was the only employee at the Kingstree Facility in her position. In his Affidavit, Weatherford describes the differences between his position and Plaintiff's position:

Ms. Smith's primary job duties were to resolve Help Desk Requests for individual employees. She was the only employee at the Kingstree facility who was primarily tasked with Help Desk duties. I sometimes helped out on Help Desk duties when she fell behind. I also helped out when Ms. Smith did not solve the employee's problem or the employee was dissatisfied with her attitude and demeanor. Dealing with day-to-day Help Desk inquiries from individual employees was not a regular part of my job duties.

My job as System Administrator was completely different from Ms. Smith's. While she was responsible for resolving computer issues experienced by individual Martek employees, my responsibility was to maintain the computer system itself, including the servers. While I opened and closed tickets, they usually referred to the system and network and not individual employee complaints. There were times when I responded to individual employee complaints because the employees were reluctant to call Ms. Smith because of the way she treated them. I also occasionally was required to re-open tickets Ms. Smith had closed because the work was not properly done or additional work was required.

Weatherford Aff. ¶¶ 5-6.

Additionally, in a facility-wide email regarding Kingstree Helpdesk procedures, Treichel also sets forth the differences between Plaintiff's and Weatherford's job responsibilities:

- Veronica Smith is Kingstree's first line Help Desk support and will respond to the tickets in the order that they come in.
- Joe Weatherford's primary responsibility is to support IT infrastructure and other operational duties. As needed, Joe may assist Veronica when Help tickets are elevated and require his involvement.

Martek Emails p. 4.

In support of her argument that Plaintiff and Weatherford performed the same duties, Plaintiff points to another email from Treichel to both Plaintiff and Weatherford, where he asks "which one of you can/does set up messaging?" Martek Emails p. 55. Plaintiff argues that the line between job responsibilities was sufficiently blurred such that even Treichel, the Manager of Networking and Information Security, was unsure of who performed what duties. However, this email shows only that Treichel was inquiring about one particular task. This email is insufficient to show that Plaintiff

-16-

and Weatherford were similarly situated because they held the same job responsibilities.

Nevertheless, even if Plaintiff and Weatherford did perform or occasionally perform the same job duties, Weatherford still is not similarly situated because he did not engage in the same conduct as Plaintiff. As set forth in detail above, throughout 2008, Treichel and other supervisors received complaints about Plaintiff's and Weatherford's failure to communicate or timely complete tasks. However, the record reveals that Weatherford's performance evaluations improved from "good" in 2008 to "excellent" in 2009, while Plaintiff's evaluations remained at "needs improvement" for both years.

In addition, while Plaintiff's termination was based in part on her past job performance issues, it was based primarily upon her failure to heed specific directives given by Weatherford in December of 2009. Plaintiff's Termination Notice specifically lists the counseling she received on December 18, 2009, regarding her professionalism in customer service, the need to have work tickets in the system by the end of each week, and the requirement that she receive approval prior to working on scheduled off times. Corrective Action Notice. It then sets forth Plaintiff's failure to abide by this counseling in several ways: her lack of customer service (citing an email from a "key member of production" who complained, "'I feel like we got the run around from [Plaintiff] again'"), her failure to maintain work ticket data (citing an audit showing Plaintiff logged only four tickets in three weeks), and her failure to obtain approval prior to working on a mandatory holiday, New Year's Day. Corrective Action Notice.

Thus, although the record reveals that both Plaintiff and Weatherford had job performance issues in 2008 and before, the evidence also shows that Weatherford's performance improved while Plaintiff's issues persisted. Furthermore, Plaintiff's termination notice shows that Plaintiff

specifically disregarded instructions from her supervisor, Weatherford.  Plaintiff fails to point to similar conduct by Weatherford.  Therefore, Plaintiff has failed to show that Weatherford engaged in the same conduct as her.

Plaintiff also argues that the conduct for which she was terminated amounts to the "Level I" offense of "poor work effort," as described in the Employee Handbook.  Employee Handbook Exerpts (Ex. F to Pl. Response).  Plaintiff argues that other employees engaged in "Level I" offenses but were not terminated.  She points to employees Nikki Lee, Matthew Evans, Sparky Avant, and C.R. Altman.  See Pl. Response p. 11.  Plaintiff describes their offenses, but provides no evidence regarding the department within which these employees worked, the supervisors under whom they worked, the longevity or repeated nature of their offenses or any other evidence that would allow the court to make a determination as to whether they were similarly situated.  She argues that, even if these other employees worked in different departments under different supervisors than Plaintiff, the relevant decisiomaker was Brian Lee, the Senior Manager of Human Resources, in all circumstances. Plaintiff points to Defendant's Management Site Guidelines, which provides that "[n]o disciplinary actions will be taken without the direct involvement of the Human Resources Department as counsel to management."  Management Site Guidelines (Ex. F to Pl. Response).  However, Lee testifies that management issues corrective actions and HR reviews them.  Lee Dep. pp. 28-29.  He further testifies that HR's review is limited to assessing consistency with the Employee Handbook and the disciplinary policy and that the recommended action is fair.  Lee Dep. p. 16-17, 29.  The limited involvement by Lee in disciplinary matters is insufficient to show that he was the relevant decisionmaker.  See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 291 (4th Cir.2004) (holding that the relevant decisionmaker is the one who is principally responsible for the

-18-

decision).  Thus, Plaintiff fails to point to any other employees who were similarly situated to her.

In sum, for the reasons discussed above, Plaintiff fails to present sufficient evidence to support a <u>prima</u> <u>facie</u> case of sex or gender discrimination.  While she fits within both protected classes and suffered adverse employment action when she was terminated, Plaintiff fails to show that she was meeting her employer's legitimate job expectations or that similarly situated individuals were treated more favorably.

In addition, even if Plaintiff could create a <u>prima</u> <u>facie</u> case of discrimination, Defendant has presented a legitimate, non-discriminatory reason for her termination.  As stated in her termination notice, Plaintiff's "performance issues have persisted, even though she has been counseled on several occasions over the last two years.  She has had ample opportunity to make improvement, and meet department expectations."  Corrective Action Notice.  Thus, the burden returns to Plaintiff to show that Defendant's legitimate reason for her termination is actually pretext for a discriminatory reason.  Plaintiff fails to do so.

Plaintiff argues that the reason given for his termination is pretext for a discriminatory motive because other employees were not terminated for the same conduct.  However, as discussed above, this argument is without merit because Plaintiff fails to show that any other employee engaged in the same or sufficiently similar conduct.

Plaintiff also argues that Defendants engaged in a pattern of discrimination that affected other African American employees who have also filed Charges of Discrimination against Defendant.  In order to prove a "pattern and practice" of discrimination, the Plaintiff must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." <u>International</u> <u>Brotherhood of Teamsters v. United States</u>, 431 U.S. 324, 336 (1977). Instead, the Plaintiff must

"establish by a preponderance of the evidence that racial discrimination was the Company's standard operating procedure – the regular rather than the unusual practice." Id. The Fourth Circuit has cautioned, however, that "pattern and practice evidence has little, if any relevance in an individual disparate treatment action." McClosky v. Prince George's County, Md., 103 F.3d 118 (Table), 1996 WL 726854, at *1 (4th Cir. 1996); see also Warren v. Halstead Industries, Inc., 613 F.Supp 499, 506, n.2 (D.C.N.C. 1985) (holding that "statistics are not sufficient to prove pretext in individual disparate treatment cases"). Aside from Plaintiff's reference to other employees who have filed charges of discrimination, Plaintiff fails to present evidence sufficient to show that racial discrimination was a part of Defendant's normal operating procedures. Thus, her pretext argument fails as well.

In sum, it is Plaintiff's burden ultimately to show that illegal discrimination was the motivating factor in her termination. It is not necessary for this court to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for Defendant's decision. Hawkins v. Pepsico, 203 F.3d 274, 279 (4th Cir.2000).[4] Plaintiff must show that a reasonable jury could believe her explanation of intentional discrimination. Id. Plaintiff has failed to meet her burden of creating a genuine dispute of material fact as to whether her termination was based upon her race or gender. Therefore, summary judgment is appropriate.

---

[4] Plaintiff insinuates that Miller purposefully asked him to complete tests he had never done before on a sample that was not present in the lab and then immediately checked behind him. This is simply speculation. Plaintiff presents no evidence to support such a claim.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that Defendant's Motion for Summary

Judgment (Document # 24) be granted and this case be dismissed.

                                               s/Thomas E. Rogers, III
                                               Thomas E. Rogers, III
                                               United States Magistrate Judge

June 28, 2013
Florence, South Carolina